UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| THEODORE J. VORE,<br><br>                     Plaintiff,<br><br>     vs.<br><br>CLIFFORD L. OSBORN,<br><br>                     Defendant. | CIV. 13-5075-JLV<br><br>ORDER |

## INTRODUCTION

Plaintiff Theodore Vore filed a complaint against defendant Clifford Osborn seeking recovery for Vore's injuries suffered in a collision between their two motorcycles on August 5, 2012.   (Docket 1).   Mr. Osborn filed an amended answer and counterclaim seeking recovery for his own injuries.   (Docket 7). Mr. Vore filed a reply to the counterclaim.   (Docket 8).   Mr. Osborn filed two Daubert[1] motions challenging the opposing party's expert witnesses and another related motion.   (Dockets 55, 57 & 70).   Mr. Vore filed a motion to strike.   (Docket 68).   Each motion will be separately resolved by this order.

## ANALYSIS

Rule 702 of the Federal Rules of Evidence governs testimony by expert witnesses and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

_____

[1] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592 (1993).

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.   Rule 703 describes the bases for expert testimony.

An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.   But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid.703.

As a preliminary matter, "[t]he proponent of the expert testimony must prove its admissibility by a preponderance of the evidence."   Lauzon v. Senco Products, Inc., 270 F.3d 681, 686 (8th Cir. 2001) (citing Daubert, 509 U.S. 579 at 592; see also Marmo v. Tyson Fresh Meats, Inc., 457 F.3d 748, 757-58 (8th Cir. 2006) (same).

The trial judge "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."[2]   Daubert, 509 U.S. at 589.

---

[2]Rule 402 states, in pertinent part, "All relevant evidence is admissible . . . ."   Rule 401 defines "relevant evidence" as evidence which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

2

The subject of an expert's testimony must be scientific, technical, or other specialized knowledge.  Id. at 589-90.  This requirement "establishes a standard of evidentiary reliability."[3]  Id. at 590; see also Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137, 147 (1999) (noting it is the word "knowledge" in Rule 702 that " 'establishes a standard of evidentiary reliability' ") (citing Daubert, 509 U.S. at 589-90).

Although Daubert deals specifically with expert testimony based on scientific knowledge, the Supreme Court extended the principles in Daubert to all expert testimony.  Kumho, 526 U.S. at 141.  "Proposed testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known."  Id.

Expert evidence is unreliable, and thus inadmissible, "if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case."  United States v. Bailey, 571 F.3d 791, 803 (8th Cir. 2009); see also United States v. Two Elk, 536 F.3d 890, 904 (8th Cir. 2008) (" '[N]othing in Rule 702, Daubert, or its progeny requires that an expert resolve an ultimate issue of fact to a scientific absolute in order to be admissible.' ") (quoting Kudabeck v. Kroger Co., 338 F.3d 856, 861 (8th Cir. 2003)).

Rule 702 requires expert testimony to be relevant, that is, to " 'assist the trier of fact to understand the evidence or to determine a fact in issue.' " Daubert, 509 U.S. at 591.  "Rule 702's 'helpfulness' standard requires a valid

---

[3]An expert witness, unlike a lay witness, may offer opinions not based on firsthand knowledge or observation.  Daubert, 509 U.S. at 592.  It is presumed the expert's opinion "will have a reliable basis in the knowledge and expertise of his discipline."  Id.

scientific connection to the pertinent inquiry as a precondition to admissibility." Id. at 591-92.   The issue is one of does the testimony "fit."   Id. at 591.   " 'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes."   Id.

In sum, "[f]aced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a),[4] whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."   Id. at 592.   "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."   Id. at 592-93.

To make this determination, a district court may evaluate one or all of a number of non-exclusive factors.   Those include whether a theory or technique

> (1) can be (and has been) tested;
>
> (2) has been subjected to peer review and publication;
>
> (3) [has a] known or potential error rate . . . and the existence and maintenance of standards controlling the technique's operation . . . ; and

---

[4]The rule provides "[p]reliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b) [pertaining conditional admissions].   In making its determination it is not bound by the rules of evidence except those with respect to privileges."   Fed. R. Evid. 104(a).   "These matters should be established by a preponderance of proof."   Daubert, 509 U.S. at 592, n.10 (citing Bourjaily v. United States, 483 U.S. 171, 175-76 (1987)).

(4) is generally accepted by the scientific community.[5]

<u>Daubert</u>, 509 U.S. at 593-94.   A district court may consider all or none of these factors; a court should consider them in cases "where they are reasonable measures of the reliability of expert testimony."   <u>Kumho</u>, 526 U.S. at 152.   The applicability of these factors will depend on the particular facts of the case.   <u>Id.</u> at 150-51.

"[T]he factual basis of an expert's opinion generally relates to the weight a jury ought to accord that opinion. . . . Thus, unless the factual or methodological basis for the testimony is fundamentally unreliable, its admission is not an abuse of discretion."   <u>Margolies v. McCleary, Inc.</u>, 447 F.3d 1115, 1121 (8th Cir. 2006).   Challenges to the factual basis for an expert's opinion do not generally affect its admissibility.   "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."   <u>Children's Broadcasting Corp. v. Walt Disney Co.</u>, 357 F.3d 860, 865 (8th Cir. 2004) (citing <u>Bonner v. ISP Technologies, Inc.</u>, 259 F.3d 924, 929-30 (8th Cir. 2001) (quoting

---

[5] "'General acceptance' is not a necessary precondition to the admissibility of scientific evidence under the Federal Rules of Evidence, but the Rules of Evidence—especially Rule 702—do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'"   <u>United States v. Rodriguez</u>, 581 F.3d 775, 794 (8th Cir. 2009) (quoting <u>Daubert</u>, 509 U.S. at 597).   "'Pertinent evidence based on scientifically valid principles will satisfy those demands.'"   <u>Id.</u> (quoting <u>Daubert</u>, 509 U.S. at 597).

Hose v. Chicago Northwestern Transportation Co., 70 F.3d 968, 974 (8th Cir. 1996)).

The United States Court of Appeals for the Eighth Circuit gives "great latitude" to district courts in determining whether expert testimony satisfies the requirements of Rule 702.   Allen v. Brown Clinic, P.L.L.P., 531 F.3d 568, 573 (8th Cir. 2008) (citing Craftsmen Limousine, Inc. v. Ford Motor Co., 363 F.3d 761, 776 (8th Cir. 2004)).   Regardless of what factors are evaluated, the main inquiry is whether the proffered expert's testimony is sufficiently reliable.   Id. at 574 (citing Unrein v. Timesavers, Inc., 394 F.3d 1008, 1011 (8th Cir. 2005) ("There is no single requirement for admissibility as long as the proffer indicates that the expert evidence is reliable and relevant.")).

Rule 702 requires a flexible approach.   Daubert, 509 U.S. at 594.   The focus of Rule 702 "must be solely on principles and methodology, not on the conclusions that they generate." Id. at 595.   "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."   Id. at 596; see also Two Elk, 536 F.3d at 903 (A district court " 'must exclude expert testimony *if it is so fundamentally unreliable that it can offer no assistance to the jury*, otherwise, the factual basis of the testimony goes to the weight of the evidence.' ") (emphasis in original) (quoting Larson v. Kempker, 414 F.3d 936, 940-41 (8th Cir. 2005)).   "[D]oubts about whether an expert's testimony will be useful should generally be resolved in favor of

admissibility." <u>Larabee v. M M & L International Corp.</u>, 896 F.2d 1112, 1116 n.6 (8th Cir. 1990) (citing J. Weinstein & M. Berger, *Weinstein's Evidence*, para. 702[02] at 702–30 (1988)).

The Eighth Circuit reviews under an abuse of discretion standard a district court's ruling admitting expert testimony.   <u>United States v. Eagle</u>, 515 F.3d 794, 800 (8th Cir. 2008); <u>see</u> <u>also</u> <u>Kuhmo</u>, 526 U.S. at 152 (A "court of appeals is to apply an abuse-of-discretion standard when it 'review[s] a trial court's decision to admit or exclude expert testimony.' ") (quoting <u>General Elec. Co. v. Joiner</u>, 522 U.S. 136, 138-39 (1997)).

**OSBORN'S <u>DAUBERT</u> CHALLENGE OF RICHARD KILEY**

Mr. Osborn challenges Richard Kiley on the basis that he is a "motorcycle safety instructor" offering "opinions on motorcycle safety issues."   (Docket 56 at p. 3).   The seemingly significant and only opinion expressed by Mr. Kiley is "that Osborn contributed to the cause [of] the accident by failing to employ proper defensive driving strategies, namely: failing to keep a proper following distance." <u>Id.</u>   Mr. Osborn argues this opinion "involves common sense and simple rules of the road which are well within the common knowledge of lay jurors."   <u>Id.</u>   Mr. Osborn further objects to the witness' testimony because he "reached [his] conclusion, not by conducting independent tests and/or analysis or by relying on the accident reconstructionists' opinions in this case, but solely on the statements of Osborn and driver safety manuals."   <u>Id.</u>

7

Mr. Osborn contends the witness' testimony is not admissible because the witness "does not know what speed Osborn and Vore were traveling prior to and at the time of impact, the actual distance between Osborn and Vore, or how many feet per second Osborn would have traveled going at his rate of speed."   Id. at p. 4.   Mr. Osborn argues Mr. Kiley does not have any "specialized training to qualify him as an expert on motorcycle safety" and "[o]ther than a certification as a driver's education instructor and holding a title of safety instructor" the witness has "no certifications and little to no additional training and/or education" to qualify him as an expert witness.   Id.

Mr. Osborn's final challenge is that Mr. Kiley's opinion is "clearly 'phrased in terms of negligence itself.' "   Id. at p. 5 (citing Zens v. Harrison, 538 N.W.2d 794, 796 (S.D. 1996) (internal quotation and citation omitted).   Mr. Osborn argues this invades the province of the jury and "does not provide useful or helpful testimony . . . as required by Rule 702."   Id.

Mr. Kiley holds a bachelor's degree in health and physical education and received certification as a driver's education instructor.   (Docket 59-1 at p. 2 (5:1-4).   He earned a master's degree in education in 1998.   (Docket 59-2 at p. 1).   These educational activities in and of themselves are not especially material to the analysis.   However, his teaching activities and additional training are significant to the court's analysis of his qualifications to testify as an expert witness.   Mr. Kiley taught driver's education for seven years.   (Docket 59-1 at p. 2 (6:9).   From 1978 to present Mr. Kiley has worked with the South Dakota Safety Council.   Id. at p. 2 (7:9-11).   In 1985, he assumed the position of

8

Director of the South Dakota Motorcycle Rider Education Program.   Id. at p. 2
(7:17-19 & 18:7-14).   Since 2010 Mr. Kiley has been the full-time director of that
program.   Id. at p. 3 (10:3-13).

Mr. Kiley teaches motorcycle operators to use a system called "Following
Distance, RiderRadar and Visual Lead Times."   Id. at p. 12 (47:10-12).   This is a
basic defensive driving strategy.   Id. at p. 7 (25:4-6).   The intent of this system
is "to indicate proper following distance and space cushion or cushion of space
. . . required."   Id. at p. 12 (48:20-22).   It was through applying this process that
Mr. Kiley arrived at his opinion testimony.   In a nutshell, Mr. Kiley testified that
"[b]ased on the materials I reviewed, it was apparent . . . that Mr. Osborn had not
employed proper defensive driving strategies that would have enabled him to
avoid the collision."   Id. at p. 7 (25:12-15).

Mr. Osborn challenges this opinion testimony arguing Mr. Kiley "reached
this conclusion, not by conducting independent tests and/or analysis or by
relying on the accident reconstructionists' opinions in the case, but solely on the
statements of Osborn and driver safety manuals."   (Docket 56 at p. 3).   Mr.
Osborn's argument on the lack of the witness' expertise culminates with his
declaration that "even if Kiley relies on his driver safety instructor experience
generally, Kiley cannot 'explain how that experience leads to the conclusion
reached, why that experience is a sufficient basis for the opinion, and how that
experience is reliably applied to the facts.' "   Id. at p. 5 (Fed. R. Evid. 702, Notes
of Advisory Committee).   Even if Mr. Kiley's opinion is generally admissible
under Rule 702, Mr. Osborn argues the opinion is "clearly 'phrased in terms of

negligence itself.' " Id. (quoting Zens, 538 N.W.2d at 796).   Mr. Osborn asserts this would tend to confuse the jury, since resolution of the issue of negligence is a jury question.   Id.   Instead, Mr. Osborn argues "[w]hat Kiley intends to testify to is nothing different than what would be expected from opposing counsel in closing argument."   Id. at p. 6.   Finally, Mr. Osborn argues Mr. Kiley "completely failed" to consider all the relevant facts in the case.   Id. at p. 7.   In Mr. Osborn's view, this includes the testimony of eye-witnesses and Mr. Osborn as well as the expert opinion report of Dr. Hamernik.   Id.   For these reasons, Mr. Osborn moves the court to exclude the testimony of Mr. Kiley.   Id. at p. 8.

Mr. Vore resists Mr. Osborn's motion.   (Docket 64).   Mr. Vore asserts "Mr. Kiley offers insight on safe riding principals [sic] such as RiderRadar, the provisions of SEE,[6] the choice of lane, staggered riding, visual lead times and other practices or skills to ensure safe riding practices."   Id. at p. 4 (referencing Docket 59-2 at pp. 2-3).   According to Mr. Vore, "[t]hese matters are not within the knowledge of the general public."   Id.   Because Mr. Osborn intends to offer the testimony of Dr. Hamernik on Mr. Osborn's "compliance with standards of reasonableness," Mr. Vore argues Mr. Kiley's "opinions are admissible."   Id.

Mr. Kiley taught motorcycle safety for many years, incorporating a number of defensive driving strategies which are frequently the subject of expert testimony in motorcycle collision cases.   His training and experience are equally relevant in assisting a jury to understand the dynamics of motorcycle collisions

---

[6]"SEE is an acronym that represents Search, Evaluate and Execute.   It is a process that can help you reduce risk in traffic."   (Docket 59-2 at p. 5) (bold omitted).

as is the testimony of an engineer who explains the physics of the accident. While a jury in western South Dakota may include a number of experienced motorcycle operators, the testimony offered by Mr. Kiley would assist the jury in determining negligence, contributory negligence and assumption of the risk. Whether Mr. Kiley's conclusions are accurate or should be accepted by the jury may be tested by vigorous cross-examination.   Moran v. Ford Motor Co., 476 F.2d 289, 291 (8th Cir. 1973).

The court finds Mr. Kiley's proposed testimony qualifies under Fed. R. Evid. 702.   Mr. Osborn's motion is denied.

## OSBORN'S MOTION TO EXCLUDE DR. LEONETTI

Mr. Osborn moves to exclude the testimony of Dr. Leonetti, not based on Daubert but because the witness' report was not timely produced.   (Docket 57). In addition, Mr. Osborn seeks sanctions against Mr. Vore consisting of the expenses and attorney's fees associated with attending Dr. Leonetti's deposition. Id.

Mr. Vore argues Dr. Leonetti was a consulting expert up until the point the court granted Mr. Vore's motion for "leave to designate an expert to testify regarding the anticipated fusion surgery and costs . . . ."   (Docket 62 at p. 3). Mr. Vore claims he was unable to make an earlier designation.   Id.   Mr. Vore argues that "[a]dopting Osborn's position would result in eliminating the distinction between consulting and testifying experts because any possibility that expert could ultimately testify would require disclosure."   Id. at p. 4.

11

Mr. Osborn counters "[t]he suggestion that Leonetti was a consulting expert is subterfuge and no good cause exists for untimely disclosure." (Docket 67 at p. 10). Mr. Osborn seeks "[e]xclusion of Dr. Leonetti's testimony . . . . [and] the expense for travel and attorney time to depose the witness . . . ." Id. at p. 16.

The following events are relevant to the current motion. On August 8, 2014, the court granted the parties' joint motion to modify the previous scheduling order. (Docket 16). The August 8 order set a deadline of November 17, 2014, for the completion of all discovery, including expert discovery. Id.

On August 19, 2014, Mr. Osborn served requests for admissions, interrogatories and requests for production of documents on Mr. Vore. (Docket 60-2). In relevant part, the requests for admissions asked Mr. Vore to admit or deny (1) whether Mr. Osborn's medical bills were reasonable and necessary; and (2) whether ankle fusion surgery recommended by Dr. Brower was reasonable and necessary. Id. at p. 4, requests for admissions ¶¶ 1 & 2. The interrogatories associated with these requests for admissions required Mr. Vore to identify the specific basis for denial and to identify "every witness who will support said denial." Id. at p. 4, interrogatories ¶¶ 1 & 2. An associated request for production of documents required Mr. Vore to "produce any document, expert opinion, report or other writing supporting [Mr. Vore's] denial" of the requests for admissions. Id. at p. 5 ¶ 2. Allowing for service by mail, Mr. Vore's responses to these discovery requests were due on September 25, 2014. See Fed. R. Civ. P. 6(a)(1) & (d) and Docket 11 ¶ 4.

12

On September 10, 2014, counsel for Mr. Vore wrote to Dr. William Leonetti of Exam Works in Minneapolis, Minnesota.   (Docket 60-6).   The purpose of the letter was to hire Dr. Leonetti to review a number of medical records, reports and depositions and answer five questions.   Id.   The questions posed to Dr. Leonetti were:

1. Is the degenerative condition identified on the MRI of March 4, 2013, the result of the motorcycle accident of August 5, 2012?

2. Is the proposed [ankle] fusion causally related to the motorcycle accident of August 5, 2012?

3. Are other treatment options available to address the complaints made by Mr. Osborn of pain and swelling?   If so, what are those treatment options?   Are you able to determine an anticipated cost of those options?

4. Is the use of acupuncture medically necessary?

5. Dr. Brower has testified that the anticipated surgical costs will exceed $50,000.00.   Can you comment on the anticipated cost of ankle surgery?   Dr. Brower described the proposed surgery with placement of an IM rod as cutting edge.   Are other fusion options available?   What would be the anticipated cost?

Id. at p. 4.   Dr. Leonetti's response to these questions was requested by September 24, 2014.   Id.

On September 24, 2014, Mr. Vore's attorney received Dr. Leonetti's responses to the above questions.[7]   (Docket 60-1).   Dr. Leonetti's responses in relevant part were as follows:

_____

[7]Mr. Vore's brief does not suggest counsel received the report at some later date.   (Docket 62).   The court presumes counsel received the report on the date indicated by fax or other electronic delivery process.

1. In all medical probability, the degenerative changes identified on the right MRI dated 03/04/2013 is a combination of pathology derived directly from the motorcycle accident of 08/05/2012 as well as preexisting arthritic changes from a previous motorcycle accident. . . . Mr. Osborn's current arthritic changes are a combination of both preexisting factors as well as his 08/05/2012 motorcycle accident, which significantly accelerated his degenerative right ankle process.

2. Similar to Answer #1, Mr. Osborn's need for right ankle fusion would be a result of preexisting factors from injuries and traumas with arthritic changes that developed prior to 08/05/2012, as well as the actual bimalleolar fracture that occurred on 08/05/2012 that accelerated the degenerative process.

3. In review of the medical records . . . [Mr. Osborn] has developed significant degenerative changes in his right ankle, most likely a culmination of several injuries, that have resulted in constant pain and symptomatology. . . . At this point, in all medical probability, Mr. Osborn is a candidate for ankle fusion surgery. The cost for ankle fusion surgery would be based on the techniques used. . . . I would recommend consideration of just fusing his ankle and not the subtalar joint, which would reduce the chance of complications, reduce the surgical time and reduce the surgical costs.  By fusing just the ankle joint and not both joints . . . medical costs would be significantly reduced $15,000 to $20,000 from his original $50,000 estimate.

4. No. . . . [acupuncture] is not curative, strictly palliative . . . treatment is deemed not medically necessary.

5. I would recommend considering just fusing his ankle joint without the rod technique. . . . By performing a minimally-invasive ankle joint fusion procedure, the cost would be considerably less and the overall outcome most likely would be improved. . . .

(Docket 60-1 at pp. 8-10).

On September 25, 2014, Mr. Vore served his responses to Mr. Osborn's requests for admissions, interrogatories and request for production of

documents.[8]   (Docket 60-3).    Mr. Vore's interrogatory responses in relevant

part stated:

> ANSWER NO. 2:   Objection.   This interrogatory seeks to invade the
> province of the jury and is speculative.   Further, discovery is
> continuing.   Without waiving the objection, Plaintiff has testified he
> does not intend to proceed with the surgery.   The decision to not
> proceed with surgery was based on Plaintiff's examination by Dr.
> Bowen, a physician chosen by Osborn to conduct a 2nd opinion, Dr.
> Anderson, who saw Plaintiff at the request of his lawyer, agreed with
> Plaintiff's decision and the advice of Dr. Bowen.

(Docket 60-3 p. 3 ¶ 2) (bold omitted).    Mr. Vore's response to the related request

for production of documents stated:

> RESPONSE NO. 2:   See deposition of Randall Brower taken July 22,
> 2014, report of Dr. Trevor Anderson dated March 10, 2014, report of
> Dr. Joel Bowen dated October 17, 2013, and the deposition of
> Clifford Osborn taken March 10, 2014.

Id. at p. 4 ¶ 2 (bold and italics omitted).

On September 26, 2014, Mr. Vore filed a motion to modify the scheduling

order.   (Docket 17).   The justification for requesting the modification was the

failure of Mr. Osborn to disclose a 2003 motorcycle accident, settlement of that

claim and Mr. Osborn's current intention to have ankle fusion surgery.   Id. at

pp. 1-2.   Mr. Vore sought leave to designate an expert to testify "regarding the

proposed surgery and the expected costs."   Id. at p. 2.   As of that filing the

November 15, 2014, deadline to complete discovery, including expert discovery,

---

[8]Mr. Vore's responses were unsigned, but his counsel assured opposing
counsel that a signed copy would be provided.   (Docket 60-4 at p. 4).   A signed
set of the responses was served on April 21, 2015.   (Docket 60-5 at p. 3).   On
that same date counsel disclosed the September 10, 2014, letter to Dr. Leonetti
which was the basis for his report.   Id.

had not expired.   The deadline for disclosure of expert witnesses' identities and reports expired on May 14, 2014.   (Dockets 11 & 16).

In Mr. Vore's brief and supporting affidavit accompanying the motion to reopen the deadline to disclose an expert witness, good cause was argued but no mention was made of Dr. Leonetti or his report.   (Dockets 18 & 20).   In correspondence on October 8 and 13, 2014, counsel for Mr. Vore asked Mr. Osborn to cooperate with an independent medical examination ("IME") conducted by Dr. Leonetti to take place near Mr. Osborn's residence.   (Docket 24-5 pp. 2-3).   No mention was made of Dr. Leonetti's prior relationship with counsel in this litigation.   Id.

On March 2, 2015, the court entered an order denying an IME and giving Mr. Vore until "March 23, 2015, to designate an expert witness to testify about Mr. Osborn's anticipated ankle fusion surgery and costs associated with the procedure."   (Docket 52 at p. 10) (bold omitted).

On March 23, 2015, Mr. Vore served on opposing counsel a supplemental designation identifying Dr. Leonetti as an expert witness.   (Docket 60-1).   Dr. Leonetti's written report dated September 29, 2014, was attached.   Id. at pp. 4-10.   On April 22, 2015, Mr. Osborn filed the motion to exclude Dr. Leonetti as an expert and seeking attorney's fees for attending his deposition.   (Docket 57). Dr. Leonetti's deposition was taken on May 15, 2015.   (Docket 67 at p. 1).   At the deposition, Mr. Osborn reserved the right to pursue the remedies sought in the current motion.   (Docket 63-3 at p. 2).

16

The questions before the court can be framed this way:   Was Dr. Leonetti hired as a consulting expert only or was it reasonably anticipated he would be a trial expert, or did his role change during the course of the litigation?

An expert witness a party anticipates may testify at trial must be disclosed in compliance with Rule 26(a)(2)(A) and (D).   Together those subsections require disclosure of an expert witness "at the times and in the sequence that the court orders . . . to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. P. 26(a)(2)(A) and (D).   This type of expert witness is commonly referred to as a "trial expert."   Discovery of the opinions of a "consulting expert" is restricted.   "Ordinarily, a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial."   Fed. R. Civ. P. 26(b)(4)(D).

The Advisory Committee Notes to Rule 26 specifically address the significance of subsection (b)(4)(D).[9]   The 1970 Amendment comments in the Advisory Committee Notes acknowledge that subsection (b)(4)(D) "deals with an expert who has been retained or specially employed by the party in anticipation of litigation or preparation for trial (thus excluding an expert who is simply a

---

[9]Prior to the 2010 amendment to Rule 26, current subsection (b)(4)(D) was numbered as Rule 26(b)(4)(B).   See Rule 26 Advisory Committee Notes, 2010 Amendment.   No change in the language of the subsection occurred.   All references will be to the current subsection (b)(4)(D).

general employee of the party not specially employed on the case), but who is not expected to be called as a witness." The 1970 Amendment comment states subsection (b)(4)(D) "is concerned only with experts retained or specially consulted in relation to trial preparation. Thus the subdivision precludes discovery against experts who were informally consulted in preparation for trial, but not retained or specially employed." Id.

The standard of Rule 26(b)(4)(D) "is not particularly helpful because it blurs the distinction between testifying experts and consulting experts based solely on whether the party who retained the expert intends to call the expert to testify at trial and, of course, those intentions may fluctuate from time to time depending upon whether that party perceives the expert's opinion will help or harm its case." Employer's Reinsurance Corp. v. Clarendon National Ins. Co., 213 F.R.D. 422, 424 (D. Kan. 2003). "Thus, whether a specially retained expert is regarded as a testifying expert or a consulting expert depends upon whether the party who retained the expert has designated the expert as one who is expected to be called as a witness at trial." Id.

Rule 26(b)(4)(D) "concerns experts retained or specially consulted in relation to trial preparations, but it also precludes discovery against experts *merely consulted* in preparation for trial but not retained or specially employed." Spearman Industries, Inc. v. St. Paul Fire & Marine Ins. Co., 128 F. Supp. 2d 1148, 1151 (N.D. Ill. 2001) (emphasis in original). "The advisory committee's note to Rule 26 indicates that the rule's silence regarding experts merely

18

consulted by a party, 'precludes discovery against [this class of] experts' . . . ." Id. (citing Fed. R. Civ. P. 26(b)(4)(D) Advisory Committee's Notes).   "Further, courts have consistently held that a party may not discover the identity of, facts known by, or opinions held by an informally consulted expert."   Id. (references omitted).

The Rule "is intended to allow litigants to consult experts in order to evaluate a claim 'without fear that every consultation with an expert may yield-grist for the adversary's mill.' "   Moore U.S.A. Inc. v. Standard Register Co., 206 F.R.D. 72, 75 (W.D.N.Y. 2001) (citing Rubel v. Eli Lilly and Co., 160 F.R.D. 458, 460 (S.D.N.Y.1995)).   "The rule is clear that the test for whether a particular expert should be treated under Rule 26(b)(4)(A) or Rule 26(b)(4)[(D)] is determined by whether the expert is 'expected to testify,' and not by whether he 'may testify.' "   Barnes v. City of Parkersburg, 100 F.R.D. 768, 769 n.1 (S.D.W. Va. 1984) (citing Hoover v. United States Department of the Interior, 611 F.2d 1132, 1141 n.12 (5th Cir. 1980)).

"Occasionally, courts must determine which standard applies to an expert who wears 'two hats' by serving as both a non-testifying consultant and a testifying expert."   Sara Lee Corp. v. Kraft Foods Inc., 273 F.R.D. 416, 419 (N.D. Ill. 2011) (citing In re Commercial Money Center, Inc., Equipment Lease Litigation, 248 F.R.D. 532, 538 (N.D. Ohio 2008).   "Most courts have held that a single expert may serve in both roles but that the broader discovery for testifying experts applies to everything except 'materials generated or considered *uniquely*

in the expert's role as consultant.' "[10]   Id. at 419-20 (citing In re Commercial Money Center, Inc., 248 F.R.D. at 538) (emphasis in original).

Dr. Leonetti was a retained expert.   He was hired by Exam Works to complete a task brought to it by Mr. Vore's counsel.   Exam Works and Dr. Leonetti were paid for their services by Mr. Vore.   Dr. Leonetti wrote a seven-page response to the questions posed to him.   (Docket 60-1 at pp. 4-10).   His opinion letter was signed.   Id. at p. 10.   The report requested by counsel mirrored the requirements of Rule 26(a)(2)(B) and the court's scheduling order. Compare Fed. R. Civ. P. 26(a)(2)(B) and Docket 11 with Dockets 60-6 & 60-1 at p. 1 ¶ 1.   "The report required by Rule 26(a)(2)(B) must be extremely thorough, and preparing it is a time-consuming task . . . ."   8A Wright, Miller & Marcus, Federal Practice and Procedure, § 2031.2 at p. 89 (3d ed. 2010).

Dr. Leonetti was not hired to discuss trial strategy and preparation under the umbrella of non-disclosure contemplated by Rule 26(b)(4)(D).   "[A]s a collaborator in the development of pretrial strategy, a non-testifying expert may become a unique repository of insights into counsel's opinion work product although the expert's information is not itself work product . . . ."   Id. at § 2032 at p. 96.   Dr. Leonetti was not consulted on an informal basis and he was "not 'specifically employed' " by Mr. Vore as contemplated by Rule 26(b)(4)(D).   USM Corp. v. American Aerosols, Inc., 631 F.2d 420, 425 (6th Cir. 1980).

---

[10]Mr. Vore is not claiming some part of Dr. Leonetti's work should be protected from disclosure to Mr. Osborn as being solely part of Dr. Leonetti's work as a consultant.

Once Mr. Vore's counsel had Dr. Leonetti's report in hand on September 24, 2014, he knew Dr. Leonetti was going to be Mr. Vore's expert at trial.   The only roadblock to the designation of Dr. Leonetti as a trial expert was the fact the deadline for designation of experts had expired in May 2014.   (Docket 11 ¶ 7). Notwithstanding the designation deadline, Mr. Vore not only asked Dr. Leonetti to opine on Mr. Osborn's ankle fusion surgical option, but also asked Dr. Leonetti to express his professional opinion on the necessity of acupuncture as a reasonable and necessary medical expense.   This second inquiry was neither a new issue nor one which was a basis for Mr. Vore's motion to reopen the deadline for the designation of experts.

The court finds Mr. Vore hired Dr. Leonetti not as a consultant to assist with trial strategy, but as a trial expert to testify, assuming the court would allow the designation after the expiration of the original deadline.   Mr. Vore was obligated as of September 24, 2014, to make the disclosures required by Rule 26(a)(2)(A) and (B) and (b)(4)(a).   When Mr. Vore responded to Mr. Osborn's requests for admissions, interrogatories and requests for production of documents on September 25, 2014, Mr. Vore was obligated to include Dr. Leonetti's opinions in the responses and disclose the expert's report.

The appropriate sanction for Mr. Vore's failure to make a timely disclosure of Dr. Leonetti's opinions and report is guided by Rule 37 of the Federal Rules of Civil Procedure.

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that

21

information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.   In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

    (A)    may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

    (B)    may inform the jury of the party's failure; and

    (C)    may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Fed. R. Civ. P. 37(c)(1).   Mr. Osborn asks the court to strike Dr. Leonetti as an expert witness and to award Mr. Osborn the attorney's fees and cost associated with the deposition of the witness.   (Docket 57).

"In determining whether a failure to disclose is substantially justified or harmless, and accordingly whether the exclusion provision of Rule 37 should apply, there are four factors a court should consider.   These considerations are " '(1) the importance of the excluded expert testimony; (2) the party's explanation for failure to disclose; (3) the potential prejudice created by permitting use of the expert testimony at trial or on a pending motion; and (4) the ability to cure any prejudice by granting a continuance.' "   Oury v. Rapid City Regional Hospital, Inc., No. CIV. 09-5061-JLV, 2011 WL 1135461 at *6 (D.S.D. Mar. 25, 2011) (citing Citizens Bank v. Ford Motor Co., 16 F.3d 965, 966 (8th Cir.1994); Sancom, Inc. v. Qwest Communications Corp., 683 F. Supp. 2d 1043, 1063 (D.S.D. Jan. 4, 2010); Transclean Corp. v. Bridgewood Services, Inc., 101 F. Supp. 2d 788, 795 (D. Minn. 2000)).

A.  IMPORTANCE OF THE EXCLUDED TESTIMONY

The court finds some of the proposed testimony of Dr. Leonetti is likely to be significant.   As the court indicated in its March 2, 2015 order, Mr. Osborn's medical condition had not changed but "it has progressed along the natural course anticipated and identified by his treating physician, Dr. Bowen."   (Docket 52 at p. 9).   Because of this progression, the court allowed Mr. Vore to designate "a witness to testify about the anticipated fusion surgery and costs associated with the procedure."   Id.   Before Dr. Leonetti's involvement in the case, Mr. Vore had no medical expert who intended to testify about Mr. Osborn's ankle fusion surgery and its associated costs.   This factor favors Mr. Vore.

B.  MR. VORE'S EXPLANATION FOR UNTIMELY DISCLOSURE

The court finds Mr. Vore's explanation for his failure to timely disclose his expert's report to be less than candid with the court and opposing counsel.   The proper course of action was to fully answer Mr. Osborn's discovery, disclose Dr. Leonetti's report, and promptly file a motion for leave to designate the witness. Instead, Mr. Vore chose to delay disclosure by objecting to Mr. Osborn's discovery on grounds not associated with Rule 26(b)(4)(D) and engaging in a protracted motion and briefing practice which did not acknowledge he had Dr. Leonetti's report in hand.   Mr. Vore's motion asking that Dr. Leonetti conduct an IME failed to disclose that Dr. Leonetti had already been retained and had written an opinion report on Mr. Osborn's injuries.

For these reasons, the court finds this factor favors Mr. Osborn.

23

C. POTENTIAL PREJUDICE TO MR. OSBORN

The court finds the potential prejudice to Mr. Osborn involves two different issues.   First, the question of Mr. Osborn's use of acupuncture and its associated expenses was not a new issue in September 2014.   His treatment and expenses were provided in discovery long before the May 2014 deadline for disclosure of expert witnesses.   Mr. Vore chose not to designate an expert to address these issues.   It was not until September 10, 2014, that Mr. Vore sought to secure Dr. Leonetti's testimony on the acupuncture issues.   That effort was untimely and no reason was offered to justify Dr. Leonetti's testimony on these issues.

Second, the potential prejudice to Mr. Osborn in permitting Dr. Leonetti to testify about ankle fusion surgery and associated expenses is minimal.   Mr. Osborn had Dr. Leonetti's report and supporting documents well in advance of his May 15, 2015, deposition.

This factor does not favor either party.

D. THE ABILITY TO CURE POTENTIAL PREJUDICE

Mr. Osborn argues because Dr. Leonetti's deposition has been taken, if the court does not grant the remedy of exclusion, "the ability to cure the prejudice cannot be undone."   (Docket 67 at p. 15).   The court disagrees that this harsh remedy is appropriate.

The court finds that a number of sanctions are appropriate.   First, Dr. Leonetti shall not testify regarding acupuncture and its associated costs.   If

24

addressed during his trial deposition, those portions are stricken consistent with this order.   If the parties are unable to agree as to the testimony impacted by this order, the parties shall address the issue through motions *in limine* in advance of the pretrial conference.

Second, Mr. Vore's response to Mr. Osborn's request for admission number one (Docket 60-3 at p. 1 ¶1) is stricken.   Admissions are sought, first, to facilitate proof with respect to issues that cannot be eliminated from the case and, second, to narrow the issues in dispute.   Donovan v. Carls Drug Co., 703 F.2d 650, 652 (2d Cir. 1983) (overruled on other grounds by McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133-34 (1988)).   "The rule seeks to serve two important goals: truthseeking in litigation and efficiency in dispensing justice." Conlon v. United States, 474 F.3d 616, 622 (9th Cir. 2007).   Request for admission number one is deemed admitted.   Fed. R. Civ. P. 36(a)(3) & (6).

Third, Mr. Osborn may disclose Dr. Leonetti's report and deposition to Mr. Osborn's treating physicians.   If those treating physicians have an opinion regarding this information, Mr. Osborn shall obtain a written report from the treating physicians and disclose it to opposing counsel.   Mr. Vore shall not engage in further discovery regarding the physicians' opinions.   Challenges to their opinions may be made by Mr. Vore through cross-examination at trial.

Fourth, Mr. Vore's motion to strike Mr. Osborn's reply brief or permit the filing of a sur-rebuttal brief (Docket 68) is denied.

**OSBORN'S <u>DAUBERT</u> CHALLENGE OF DR. LEONETTI**

Separate from Mr. Osborn's motion to strike the testimony of Dr. Leonetti, Mr. Osborn filed a <u>Daubert</u> challenge of the doctor's testimony.   (Docket 71).

Mr. Vore was granted the opportunity "to designate an expert witness to testify about Mr. Osborn's anticipated ankle fusion surgery and costs associated with the procedure."  (Docket 52 at p. 10).   The court permitted this opportunity because Mr. Osborn's treating surgeon Dr. Brower testified it was his recommendation that Mr. Osborn undergo "an ankle joint fusion with . . . an IM rod or big metal rod to help fuse the ankle joint and the joint beneath it." (Docket 52 at p. 7 (referencing Docket 24-1 at p. 6 (31:20- 32:6)).   "Because of Mr. Osborn's age and diabetic condition, Dr. Brower recommended an ankle fusion over an ankle replacement."   <u>Id.</u> (referencing Docket 24-1 at p. 7 (35:23-36:18)).   "Dr. Brower testified the total cost of an ankle fusion procedure would be between \$30,000 and \$50,000."   <u>Id.</u> (referencing Docket 24-1 at p. 7 (39:8-14)).

Mr. Vore designated Dr. Leonetti as his trial expert for this purpose.   Dr. Leonetti holds a degree in podiatric medicine and his specialty is foot and ankle surgery.   (Docket 72-1 at p. 3 (5:8-9)).   He has been an Arizona licensed podiatrist and practiced in this area of medicine for 35 years.   <u>Id.</u> at p. 3 (6:5-6); <u>see</u> <u>also</u> Docket 72-2 at p. 1.   In that capacity he "treat[s] pathology, diseases, injuries, traumas to the lower extremities."   (Docket 72-1 at p. 3 (5:9-11)).   He is a fellow of the American College of Foot and Ankle Surgeons.   <u>Id.</u> at p. 3

(5:16-17).   He is board certified by what is now known as the American Board of
Foot and Ankle Surgery and the American Board of Podiatric Surgery.   Id. at pp.
3 (5:21-24) & (8:21-23).

Dr. Leonetti testified that "in lieu of treating the ankle pain with a subtalar
joint ankle fusion [recommended by Dr. Brower] or calcaneal to tibial fusion,
consideration should be given to just performing a primary ankle fusion. . . . the
least invasive [procedure] . . . called an arthroscopic-assisted fusion."   Id. at
p. 6 (18:21-24 & 20:9-10).   Dr. Leonetti testified "the subtalar joint is normal.
There's no disease process in the subtalar joint, so the thought process is why
would you destroy the subtalar joint when you can do the ankle joint solely."   Id.
at p. 13 (46:2-5).   Dr. Leonetti explained that "the problem with [an IM rod ankle
fusion] is you have to take two joints completely apart and scrape the cartilage
down to bleeding bone on both joints in order for that to work successfully.
Whereas if you do just the ankle, you limit your dissection."   Id. at p. 15
(56:9-13).

Dr. Leonetti testified that in his 35 years of practice he has never
performed any type of ankle fusion:   "I don't do ankle fusions. . . . Not ankle
fusions[,] [s]ubtalar joint fusions, triple arthrodesis[,] [m]idfoot fusions, forefoot
fusions.   I don't do ankle fusions."   Id. at p. 13 (48:3-9).   He explained "it's a
procedure I choose not to do.   But I deal with the disease process, preop, postop,
make the diagnosis, and treat it afterwards."   Id. at p. 15 (54:15-18).   Dr.
Leonetti acknowledged that "[i]f Mr. Osborn followed my suggestion, he would

27

find a surgeon that specializes in ankle fusion surgery."   Id. at p. 13 (48:14-15).
He recognized that "IM rod surgery" is a "highly specialized surgery."   Id. at p. 13
(45:1-7).

 "A witness does not have to be a specialist in a particular field to be
qualified as an expert."   United States v. Black Hills Power, Inc., No. CIV.
03-5020-KES, 2006 WL 6908315 at *2 (D.S.D. June 12, 2006) (referencing Miller
v. Heaven, 922 F. Supp. 495, 502 (D.Kan. 1996) ("[T]he touchstone of
admissibility is helpfulness to the trier of fact. . . . Moreover, a lack of
specialization does not affect the admissibility of the [expert's] opinion but only
its weight, . . . although a[n expert] must have skill in the matter to which the
subject relates. . . . An expert must, however, stay within the reasonable confines
of his subject area and cannot render expert opinions of an entirely different field
or discipline.") (internal quotation marks and citations omitted).   "Whether a
witness's specialized knowledge will be helpful to the jury is the central concern
in determining whether a witness is qualified to testify as an expert."   Id.   "So
long as an expert has sufficient knowledge to aid the jury, concerns about his
. . . lack of specialty within the field go to weight of the evidence."   Id. at 2006 WL
6908315 at *26.   Any doubt about the usefulness of Dr. Leonetti's "testimony
. . . should . . . be resolved in favor of admissibility."   Larabee, 896 F.2d at 1116
n.6 (internal citation omitted).

 While Dr. Leonetti does not perform ankle fusion surgery, he is qualified to
discuss the implications of the arthroscopic procedure and an invasive IM rod

28

ankle fusion.   "Vigorous cross-examination" and "presentation of contrary evidence" will permit the jury to determine whether to adopt this evidence or what weight to give to it.   Daubert, 509 U.S. at 596.   This is "the traditional and appropriate means of attacking shaky but admissible evidence."   Id.

On the question of the cost of an IM rod ankle fusion surgery, Dr. Leonetti testified "if that particular surgery was performed in that fashion with that equipment, I believe the price would actually be more [than the $50,000 projected by Dr. Brower]."   (Docket 72-1 at p. 12 (42:11-16).   In Dr. Leonetti's patients' experiences "the cost is usually over $50,000.   I've seen it probably as low as the 40s and high [as] close to 100."   Id. at p. 7 (23:16-18).   He testified a minimally invasive ankle fusion would cost between $10,000 and $20,000.   Id. at p. 7 (22:23-25).   Dr. Leonetti arrived at these figures regarding the various costs for ankle fusion surgery through "talking to physicians that do this procedure" and his own "experience with [his] patients."   Id. at pp. 7 (22:18-19) & 7 (23:16-18).   "An expert may base an opinion on facts or data . . . that the expert has been made aware of or personally observed."   Fed. R. Evid. 703.   These various surgical costs are a valid area of testimony by Dr. Leonetti.

The court finds Dr. Leonetti's proposed testimony qualifies under Fed. R. Evid. 702.   Mr. Osborn's Daubert challenge is denied.

## ORDER

Based on the above analysis, it is

ORDERED that Mr. Osborn's Daubert motion challenging the testimony of Richard Kiley (Docket 55) is denied.

29

IT IS FURTHER ORDERED that Mr. Osborn's <u>Daubert</u> motion challenging the testimony of Dr. Leonetti (Docket 70) is denied.

IT IS FURTHER ORDERED that Mr. Osborn's motion for sanctions and to exclude the testimony of Dr. Leonetti (Docket 57) is granted in part and denied in part.

IT IS FURTHER ORDERED that Mr. Vore's response to Mr. Osborn's request for admission number one (Docket 60-3 at p. 1 ¶1) is stricken.   Mr. Osborn's request for admission number one is deemed admitted.

IT IS FURTHER ORDERED that Dr. Leonetti may testify at trial consistent with this order.

IT IS FURTHER ORDERED that Dr. Leonetti shall not testify regarding acupuncture and its associated costs.   If addressed during his trial deposition, those portions are stricken consistent with this order.

IT IS FURTHER ORDERED that Mr. Osborn may disclose Dr. Leonetti's report and deposition testimony to Mr. Osborn's treating physicians.   If those treating physicians have opinions regarding Dr. Leonetti's opinions, Mr. Osborn shall obtain a written report from the treating physicians and disclose it to Mr. Vore.   Mr. Vore shall not engage in further discovery regarding the physicians' opinions.

IT IS FURTHER ORDERED that Mr. Vore's motion (Docket 68) is denied.

Dated March 9, 2016.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
CHIEF JUDGE

30